THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* LEO J. MLECZKO, Appellant.

Argued March 16, 1948; decided July 16, 1948.

154

*William B. Mahoney* and *John B. Corcoran* for appellant.
I. The preliminary proof was clearly insufficient to warrant
the admission of the dying declaration in evidence. (*People* v.
*Mikulec,* 207 App. Div. 505, 240 N. Y. 573; *People* v. *Sarzano,*
212 N. Y. 231; *People* v. *Falletto,* 202 N. Y. 494; *People* v. *Ricken,*
242 App. Div. 106.) II. The trial court erroneously submitted
the question of the '' statement's '' admissibility to the jury as
a question of fact. (*People* v. *Ludkowitz,* 266 N. Y. 233; *People*

v. *Bartelini,* 285 N. Y. 433; *People* v. *Falletto,* 202 N. Y. 494; *People* v. *Smith,* 104 N. Y. 491; *People* v. *Kraft,* 148 N. Y. 631; *People* v. *Infantino,* 224 App. Div. 193; *People* v. *Corey,* 157 N. Y. 332.) III. The trial court committed additional error in permitting the last sentence of the alleged dying declaration of decedent to be read into evidence. (*People* v. *Smith,* 172 N. Y. 210; *People* v. *Becker,* 215 N. Y. 126.) IV. The trial court committed reversible error in allowing in evidence the testimony of eight witnesses relating to an alleged identification of the defendant by the victim of the homicide. (*People* v. *Pignataro,* 263 N. Y. 229; *People* v. *Dolce,* 261 N. Y. 108; *People* v. *Rutigliano,* 261 N. Y. 103; *People* v. *Marendi,* 213 N. Y. 600; *People* v. *Smith,* 172 N. Y. 210; *Greener* v. *General Elec. Co.,* 209 N. Y. 135; *People* v. *Sprague,* 217 N. Y. 373; *People* v. *Cascone,* 185 N. Y. 317; *People* v. *Infantino,* 224 App. Div. 193; *People* v. *Malkin,* 218 App. Div. 635.) V. The trial court erred in refusing the defendant's request to charge which related to the weight to be given to dying declarations and the request to charge that the defendant was under no duty to speak when taken to the bedside of the deceased where he was allegedly identified as her assailant. (*People* v. *Bartelini,* 285 N. Y. 433; *People* v. *Ludkowitz,* 266 N. Y. 233; *People* v. *Falletto,* 202 N. Y. 494; *People* v. *Kraft,* 148 N. Y. 631; *People* v. *Pignataro,* 263 N. Y. 229; *People* v. *Dolce,* 261 N. Y. 108; *People* v. *Rutigliano,* 261 N. Y. 103; *People* v. *Marendi,* 213 N. Y. 600; *People* v. *Smith,* 172 N. Y. 210.) VI. The manner in which the alleged confessions were extorted from the defendant and their receipt in evidence upon the trial constituted a violation of the defendant's rights guaranteed by the Fourteenth Amendment to the United States Constitution. (*People* v. *Malinski,* 292 N. Y. 360; *People* v. *Mummiani,* 258 N. Y. 394; *Malinski* v. *New York,* 324 U. S. 401; *Ashcraft* v. *Tennessee,* 322 U. S. 143; *Chambers* v. *Florida,* 309 U. S. 227; *Lyons* v. *Oklahoma,* 322 U. S. 506; *Lisenba* v. *California,* 314 U. S. 219.)

*Edwin G. O'Connor, District Attorney,* for respondent. I. The written and oral confessions of defendant were properly admitted in evidence. (*People* v. *Elmore,* 277 N. Y. 397; *People* v. *Doran,* 246 N. Y. 409; *People* v. *Malinski,* 292 N. Y. 360.) II. The dying declaration was properly admitted in evidence.

(*People* v. *Bartelini,* 285 N. Y. 433; *Johnson* v. *State,* 102 Ala. 1; *Sims* v. *State,* 139 Ala. 74; *People* v. *Crews,* 102 Cal. 174; *Mackabee* v. *Commonwealth,* 78 Ky. 380; *State* v. *Garth,* 164 Mo. 533; *People* v. *Marendi,* 213 N. Y. 600.)   III. It was not error to admit in evidence the testimony relative to the identification of defendant by deceased.   IV. There was no error in the charge relative to the weight to be given to dying declarations and the trial court's refusal to charge that defendant was under no obligation to speak when taken to bedside of deceased where she identified him.   (*People* v. *Rutigliano,* 261 N. Y. 103.)

FULD, J.   An atrocious crime committed upon Lydia C. Warner, a married woman in her forties, resulted in her death.   Her condition following the attack upon her was so desperate that her treatment consisted solely of emergency measures to prolong her life.   She remained alive for four days, in a condition of shock, and died on March 14, 1946.   Charged with killing her, defendant was convicted of felony murder in the first degree and sentenced — upon the jury's recommendation — to life imprisonment, and no one may deny that the record contains evidence sufficiently convincing to warrant a verdict of guilt. However, errors fundamental and grievous, errors which went to the very heart of the issue, compel reversal and a new trial.

No purpose is to be served by detailed treatment of the evidence, and we need but observe at this point that, shortly before her death, Mrs. Warner made a dying declaration naming defendant as her assailant, confirming an earlier identification, and that defendant orally and in writing acknowledged his guilt.   Objection to the admissibility of the confessions and to the receipt in evidence of the dying declaration need not detain us.   Whether or no the confessions were free and voluntary was properly left to the jury (see *People* v. *Doran,* 246 N. Y. 409; *People* v. *Jones,* 297 N. Y. 459; *People* v. *Lonergan,* 294 N. Y. 942, certiorari denied 326 U. S. 772; cf. *People* v. *Pignataro,* 263 N. Y. 229, 240–241), and ample and clear was the proof that the declaration was made under a sense of impending death without hope of recovery.   (See *People* v. *Bartelini,* 285 N. Y. 433, 440–441; *People* v. *Ludkowitz,* 266 N. Y. 233, 238; *People* v. *Sarzano,* 212 N. Y. 231, 235; *People* v. *Falletto,* 202 N. Y. 494, 499.)

To see in proper focus the errors deemed serious, we turn to the dying declaration and its contents, to the earlier identification made by the deceased and the manner in which it was proved.

Several hours before her death on March 14th, Mrs. Warner was advised by physicians that she was dying and that no hope existed for her recovery. A written statement, previously prepared by the chief of police, was read to her. She signed it with an " X ". Insofar as pertinent, it recited that " ' Leo Mleczko a section hand came to Plate Tower at Dunkirk, N. Y., where I was working alone. I let him in because I knew him as one of the section hands. All of a sudden he attacked and beat me. The Leo Mleczko I mean is the same man I identified here at the hospital last nite.' " On the previous night, defendant, handcuffed and in the custody of the police, had been taken to Mrs. Warner's hospital room. Eight people were gathered there, and each of them testified that, when asked whether she saw her assailant in the room, the dying woman looked slowly about the room until her eyes rested upon defendant, and that, then, she replied, " ' Yes, Leo ' ".

Such testimony could not have failed but make a strong impression upon the jury, and strenuous objection is now voiced not only to the declaration, but also to the inclusion of its last sentence to the effect that there had been a prior identification.

It has been said that a dying declaration " may not properly include narrations of past occurrences " and that only those statements contained therein are admissible which bear upon " the circumstances " of the declarant's death (*People* v. *Smith,* 172 N. Y. 210, 242–243; see, also, *People* v. *Becker,* 215 N. Y. 126, 145). However, those observations must be read in their context, in the light of the contents of the declarations under consideration. We would hesitate long before excluding a statement in the declaration which would serve to identify the killer. Certainly, no rule of law required deletion of the sentence to the effect that the assailant was the man whom the declarant had identified the night before. And if doubt existed that defendant was the " Leo Mleczko a section hand ", named in the declaration, that doubt could assuredly be dissipated, and properly, by evidence of the earlier identification.

While the People may thus have been enabled to show that Mrs. Warner had previously pointed out defendant as her assailant — in order to establish that he was the Leo Mleczko in question — the prosecution was not thereby privileged to go beyond that permissible limit. Entitled to call out evidence for one purpose, the district attorney was not permitted to use it — as quite obviously he did — for another. (Cf. *People* v. *Zackowitz*, 254 N. Y. 192, 199–200.)

That identification of "last nite" could have been quickly demonstrated by the testimony of any one of the witnesses who had been in the room. The district attorney, however, called all eight, and each of them testified, in identical fashion, as to the manner in which Mrs. Warner designated defendant as her assailant. The prosecutor did not stop there; he went further and, from seven of the eight witnesses, he elicited the additional and exceedingly damaging fact that, when the woman accused him of attacking her, he stood silently by, doing nothing, saying nothing.

This was damning evidence and — even had it not been seven times repeated — must have had a devastating effect, carrying with it, as it did, overpowering implications. And the prosecutor, undoubtedly realizing this, forcefully and persuasively reminded the jurors, in his summation, of defendant's silence with these words: " And Mleczko stood there at the side of the bed, ladies and gentlemen, as cold, as brutal, and as stoic as he is sitting there right now. And he did not say one single, solitary word when Lydia Warner identified him. Now, you know, ladies and gentlemen, that if any one of you, or anybody, was identified in that manner at that time by Mrs. Warner of having been the one that attacked her, if they did not do it, what would they do, ladies and gentlemen? Would they stand there as cold and stoic as that man is sitting there now and say nothing? You know very well they would not, ladies and gentlemen. You know they would say, ' Why, I didn't do this.' You know they would reiterate their innocence. But he didn't say a word."

In our discussion, we put aside defendant's claim, made at the trial — and it stands uncontradicted on the record before us — that he " didn't say a word " because the police chief had warned him that, when " we get to the hospital, you better keep your mouth shut * * * you better not say anything."

This court has repeatedly held that, when the accused was under arrest, " he was not  *  *  *  called upon to speak or deny an accusation " and that, under such circumstances, " silence could not be construed as an admission ". (See, e.g., *People* v. *Rutigliano*, 261 N. Y. 103, 106; *People* v. *Pignataro*, 263 N. Y. 229, 236, *supra*; *People* v. *Marendi*, 213 N. Y. 600, 613.) The reason for the rule, founded on good common sense, is self-evident. " No cautious person, when in custody, accused of crime would care to enter into a discussion of his guilt or innocence with his captors  *  *  *  when what he said might be used against him.  *  *  *  He is then under no duty to speak and his silence should not be counted as giving assent to what he hears. If he had counsel, he would doubtless be advised not to talk. If he had not, he should not be prejudiced thereby." (*People* v. *Rutigliano, supra*, p. 107.)

The error and the prejudice engendered was brought to a head by the trial court's refusal to advise the jurors that defendant was " under no duty "— while in police custody — to deny the victim's accusation that he was her assailant and to instruct them that no inference could be drawn against defendant " because of his silence or his failure to reply." The proof that defendant, to employ the prosecutor's words, " stood there at the side of the bed  *  *  *  cold  *  *  *  brutal, and  *  *  *  stoic ", uttering " not  *  *  *  one single, solitary word when Lydia Warner identified him ", was, as already observed, powerful and devastating. If silence was, as urged, " to be counted as giving assent to what he hears ", defendant's protestations of innocence, his claim that the confessions were extorted and coerced, were rendered futile — for here, the jurors must have reasoned, was an acknowledgment of guilt openly and freely made, without the slightest pressure, in the presence of many witnesses. In truth, such testimony went far toward removing the issue of voluntary or involuntary confession from the case and virtually deprived defendant of his defense.

In short, receipt of the evidence referred to, its emphatic reiteration by the prosecutor, and the court's refusal to instruct as requested concerning defendant's silence, constituted a series of errors capable of working incalculable harm upon defendant, errors so basic and substantial as to defy evaluation.

Similarly harmful and to a degree also impossible of admeasurement was another error committed by the trial court in refusing a further request to charge concerning the weight to be accorded the declaration. After pointing out that a dying declaration is admissible " to protect the innocent and punish the guilty " and " in order to prevent injustice ", the judge went on to tell the jury that " Judicial expression sometimes indicates that dying declarations should be scrutinized with great care. All testimony must be scrutinized with great care. And what is meant is to emphasize that dying declarations are an exception to the rule against so-called hearsay testimony." Under such a charge, the jury was free to treat and evaluate the dying declaration as testimony given under oath. That was misleading, for the law is otherwise. (See *People* v. *Bartelini,* 285 N. Y. 433, 442, *supra*; *People* v. *Ludkowitz,* 266 N. Y. 233, 242, *supra*; *People* v. *Falletto,* 202 N. Y. 494, 500, *supra*.) Made without the test of cross-examination, " with no fear of prosecution for perjury " and with only the uncertain promptings of " fear of punishment after death " to assure truthfulness, and at a time " when the body is in pain, the mind agitated and the memory shaken by the certainty of impending death ", dying declarations have been characterized as " dangerous ". (*People* v. *Falletto, supra,* p. 499; see, also, *People* v. *Bartelini, supra,* p. 440; *People* v. *Corey,* 157 N. Y. 332, 349.) As this court has observed, " Experience shows that dying declarations are not always true " and that " dying persons have made self-serving declarations, such as false accusations, in order to destroy their enemies, and false excuses in order to save their friends." (*People* v. *Falletto, supra,* pp. 499–500.)

It is evident, therefore, that defendant was entitled to have the jury instructed, as he requested, that the dying declaration " is not to be regarded by the jurors as having the same value and weight " as the sworn testimony of a witness in open court. The court's refusal to so charge, we recently ruled, was " erroneous and * * * so prejudiced the defendant's rights as to require a new trial in the interest of justice." (*People* v. *Bartelini, supra,* p. 442.)

In addition, we note that there is much in the district attorney's summation to which exception might be taken — particu-

larly, his statement " in my opinion the police used remarkable restraint in not giving him [the defendant] his just dues." '

It is urged, nevertheless, that there should be an affirmance because there is evidence that defendant confessed. The answer — quite apart from other considerations — is simple. We do not know whether the jury would have returned a verdict of guilt with only the confessions before it. Indeed, we cannot even say whether the jury would have returned such a verdict upon the strength of both confession and dying declaration if only competent proof had been introduced and proper instructions given.

An appellate court is directed to disregard " technical errors * * * which do not affect * * * substantial rights " (Code Crim. Pro., § 542). Manifestly, the Legislature could never have purposed that the court should regard errors as technical, no matter how grave or substantial they may be, upon the hypothesis that, in any event, the jury correctly decided the case. Such a course would tend to abolish " all forms of law taught by experience to be necessary to the protection of the innocent ". (*People* v. *Marendi*, 213 N. Y. 600, 619, *supra*.) What the Court wrote in that case some years ago is just as true today: " where prejudicial matter is erroneously received in evidence on a disputed question of fact, its harmful character cannot be determined solely by the mere weight of competent evidence unless we are to resolve ourselves into a jury and, ignoring the finding upon incompetent evidence, substitute one upon the evidence which we may deem competent." (*People* v. *Marendi, supra,* p. 619; see, also, *People* v. *Pignataro,* 263 N. Y. 229, 240, *supra*; *People* v. *Sobieskoda,* 235 N. Y. 411, 420.)

Though there may be no yardstick to measure error and differentiate between the technical and the substantial, an underlying and controlling principle is at hand. If study of the case on appeal persuades the court that the minds of the jurors were clearly directed to the true issue involved, that they were not misled or confused to defendant's detriment, then the mandate of section 542 should be followed — even though the appellate judges may disagree with the verdict at which the jury arrived. On the other hand, if the court believes that the errors may have misled the jury, may have influenced the verdict, then the error may not be deemed technical, and a reversal will follow — even though the court may conclude that the jury properly decided the case on the evidence adduced.

In the light of such a standard, it is our view that prejudicial evidence was erroneously received on a vital issue, that improper use was made of it and that the jury was permitted — through the court's refusal to charge indisputably correct requests — to find defendant guilty upon the strength of it. Vicious though the crime was, convincing though the evidence of guilt may seem to be, we could affirm only if we were to announce a doctrine that the fundamentals of a fair trial need not be respected if there is proof in the record to persuade us of defendant's guilt. We are not prepared to announce such a doctrine. (See *People* v. *Marendi, supra,* p. 620.) It is for jurors, not judges of an appellate court such as ours, to decide the issue of guilt.

The judgments should be reversed and a new trial ordered.

LOUGHRAN, Ch. J., LEWIS, CONWAY, DESMOND, THACHER and DYE, JJ., concur.

Judgments reversed, etc.