Robert O. (Bob) HURT, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12259.

Criminal Court of Appeals of Oklahoma.

May 29, 1957.

Sid White, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., James W. Bill Berry, County Atty. and Harold C. Theus, Asst. County Atty., Oklahoma County, for defendant in error.

POWELL, Judge.

This case is here for the purpose of reviewing the action of the district court of Oklahoma County, which after hearing, refused to grant a writ of error coram nobis,[1] which is to say, to grant the petitioner a new trial for alleged errors of fact, said to have been unknown at the time of trial of State v. Hurt in the district court of Okahoma County on February 11, 1955, and which, if known, would have brought about a different result. A number of grounds were set out in the petition, which was filed on February 6, 1957 in this court, attached to an application for leave to file in the district court of Oklahoma County, the court that in its case No. 22662 rendered the judgment in question. This constituted

---

1. "Although the two terms [coram nobis and coram vobis] have been used interchangeably by good authority, the writ of error coram nobis differs from a writ of error coram vobis in that the writ coram nobis is issued from a court to correct certain errors of fact made in the court that issues the writ, while the writ coram vobis is issued to correct certain errors of fact made in an inferior tri-

proper procedure. Hendricks v. State, Okl.Cr., 297 P.2d 576.[2] Permission was granted, as the petition alleged a course of fraudulent conduct on the part of the prosecuting officials and certain witnesses alleged to have been only discovered at the time of application, which was sufficient on the face. to make out a prima facie case.

A long list of authorities supports the statement found in 24 C.J.S. Criminal Law § 1606, p. 149, that:

"The writ does not ordinarily lie for alleged false testimony at the trial",

but the Supreme Court of the United States in Mooney v. Holohan, 294 U.S. 103, 115, 55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406, held that the constitutional requirement of due process is not satisfied where a conviction is obtained by the presentation of testimony known to the prosecuting authorities to be perjured.

See 14th. Amendment to the Constitution of the United States, and art. II, § 7, Const.Okl.

Petitioner-defendant urges the case of People v. Savvides, 1 N.Y.2d 554, 154 N.Y.S.2d 885, 136 N.E.2d 853 (July, 1956), as being in point and as supporting his right to the writ sought. We have not only examined that case, but the earlier cases of People v. Creasy, 236 N.Y. 205, 221, 140 N.E. 563; and People v. Mleczko, 298 N.Y. 153, 81 N.E.2d 65, 69. Also bearing on the development of the use of the writ of error coram nobis in New York State, New York ex rel. Whitman v. Wilson, 318 U.S. 688–692, 63 S.Ct. 840, 87 L.Ed. 1083; and Coram Nobis, by Eli Frank.[3]

We are in general in agreement with the New York cases, and in particular with the holding in the Savvides case.

But is Savvides in point in the facts of the case before us? That will be the point for determination.

In the Savvides case one Mantzinos was "apprehended while picking up a quantity of marijuana from a locker in a New York City bus terminal". [1 N.Y.2d 554, 154 N.Y.S.2d 886.] He implicated Savva Savvides, as the one from whom he had obtained the narcotic drug. Thereafter Mantzinos pleaded guilty to felonious possession with intent to sell, which carried with it a mandatory minimum sentence, and thereupon the "assistant district attorney advised the court that the plea was taken with the 'understanding' that, upon Mantzinos' 'continued, truthful co-operation,' the district attorney would 'permit' him to withdraw it and plead guilty to a lesser crime, one carrying no mandatory minimum."

Savvides was tried before a different judge and witness Mantzinos denied that the prosecuting attorney had promised him anything, and the same attorney who had advised the judge accepting what amounted to a conditional plea of guilty, stood by and did not correct the lie.

We quote from the body of the opinion:

"Some days after the jury found Savvides guilty, the agreement with Mantzinos was carried out. The court, assured by the district attorney that Mantzinos' co-operation was 'the ultimate factor' in obtaining that conviction, suspended execution of the one

---

bunal." 24 C.J.S. Criminal Law § 1606, p. 144. The term for our purpose is *coram nobis.*

2. As an apparent precautionary measure by reason of there being no statutory procedure, the petitioner not only filed application for writ in case No. 22,662, in the trial court, but also filed the same petition in two separate cases, No. 24,257 (criminal) and No. 140,568 (civil), which cases were consolidated by the trial court

for purpose of hearing. From what we said in the Hendricks case, it should have been apparent that the filing of the application under a new number was wholly unnecessary, the object of the writ being to obtain relief in the original case in the court where the case was tried, and if possible before the actual trial judge.

3. Published by Newkirk Associates Inc., Albany, N. Y.

to two year sentence of imprisonment which it had imposed, after allowing him to withdraw his original plea and plead guilty to an attempt."

Savvides, learning of these matters, sought a writ of error coram nobis, which was denied by the trial court, and on appeal by the Appellate Division, but was allowed by the Court of Appeals of New York. The court held:

" * * * Where witness for the prosecution falsely testified that there was no agreement that he was to receive lenient treatment for testifying against defendant, Assistant District Attorney should have exposed the lie of the witness, and failure to do so constituted error so fundamental and substantial that verdict of guilty would not be permitted to stand, even though proof of defendant's guilt may have been convincing."

And in the body of the opinion the court said:

"Where a promise of leniency or other consideration is held out to a self-confessed criminal accomplice for his co-operation, there is grave danger that, if he be weak or unscrupulous, he will not hesitate to incriminate others to further his own self-interest. Long experience in granting leniency to 'co-operative' accomplices has undoubtedly shown the hazards in the practice to be more than offset by benefits to society in the detection and punishment of crime. It requires no extended discussion, however, to establish that the existence of such a promise might be a strong factor in the minds of the jurors in assessing the witness' credibility and in evaluating the worth of his testimony. The failure to disclose an 'understanding' or a promise cannot but seriously impair the jury's ability to pass upon this vital issue, and that is precisely the infirmity under which the jurors labored in the case before us."

It was pointed out that while the trial judge by interrogation elicited some vague answers which might have induced the jury to believe that Mantzinos was "hoping" for leniency, and his charge to the jury indicated the judge's own belief that the witness entertained such hope, the appellate court said:

"But that is a far cry from positive knowledge that Mantzinos had actually been assured consideration in return for continued co-operation and that he had deliberately lied about the matter on the stand."

In the within case petitioner-defendant had been charged with Adrian Wayne Burns and Charles Edwin York with the crime of robbery with fire-arms, and in a case where a curling iron was inserted in the victim's rectum and plugged into an electric socket, and causing him serious injury, but resulting in his disclosing the hiding place of $5,000 in money and $2,800 worth of diamonds.

Petitioner, hereinafter referred to as defendant, was tried, found guilty by the verdict of a jury, but the penalty was left to be fixed by the court, who on March 16, 1955 fixed the punishment by sentence of 45 years imprisonment in the State Penitentiary. Defendant appealed to this court, and in case No. A–12,259, Hurt v. State, Okl.Cr., 303 P.2d 476, the Criminal Court of Appeals on September 8, 1956 affirmed the judgment. On October 20, 1956 petition for rehearing was filed by new counsel, and was heard and denied, after various continuances on account of the death, in August, 1956 of David Tant, the attorney handling the appeal. New counsel (O. A. Cargill and Duke Duvall) at time of oral argument, frankly admitted that the evidence and facts disclosed by the record fully sustained the conviction of the defendant Hurt, and that they had no brief in that regard, but they did earnestly present a legal question as to the admissibility of the testimony of attorney Massad, who testified for the State. That matter had been

fully treated by this court in the opinion theretofore promulgated, so that the petition for rehearing was denied.

A second petition for rehearing was filed November 26, 1956 by newer counsel, Sid White, Esq., was heard and overruled, and on January 10, 1957 defendant was granted until March 11, 1957 in which to perfect an appeal to the Supreme Court of the United States, and then by reason of the coram nobis procedure, this time was subsequently extended, and the issuance of mandate stayed.

■ As a background for the consideration of the denial by the trial court of the granting of a writ of error coram nobis, we shall take judicial knowledge of the disposition of the separate cases against petitioner-defendant's alleged accomplices, York and Burns, as disclosed by designated proceedings before this court.

To commence with, Charles Edwin York and Adrian Wayne Burns under date of December 7, 1953 were indicted by a grand jury of Oklahoma County for conjoint robbery with firearms; a severance was granted and York was tried before a jury on March 20, 1954, found guilty and the jury fixed his punishment at 45 years confinement in the penitentiary. Judgment and sentence was dated March 30, 1954. Notice of appeal to the Criminal Court of Appeals was given, and petition in error and transcript was filed in this court on May 10, 1954 and additional time was granted for the purpose of supplementing the record by a transcript of the evidence taken at the trial. It was sought to have the record prepared at the expense of the county, but David Tant, a lawyer of Oklahoma County, having admitted in open court that the Burns family had paid him several thousand dollars to defend Burns and his co-defendant York, this court refused to order a record at the expense of Oklahoma County, and no further record was ever filed, although counsel was advised that the evidence in narrative form would be acceptable, where agreed upon by counsel for the State, and settled by the trial judge, or in case of dispute, as finally settled by the trial judge. In absence of record this court was compelled to and did affirm the case. See York v. State, Okl.Cr., 281 P.2d 769 (March, 1955).

An information was filed in the district court of Oklahoma County against Robert O. (Bob) Hurt on July 15, 1954 wherein he was charged with the crime of robbery with firearms "acting conjointly and together with Charles Edwin York and Wayne Adrian Burns." The first trial of Hurt commenced November 16, 1954. York testified for the State and admitted that he had testified falsely in his own behalf in his trial. York's appeal was then pending in the Criminal Court of Appeals, but he was apparently of the opinion that his attorney, who was also representing Hurt, had abandoned him. York confessed his part in the robbery with which he was charged, and implicated his alleged accomplices, Burns and Hurt. The jury could not agree, and a mistrial was declared.

Thereafter, Hurt's second trial commenced February 14, 1955 and he was convicted, the court fixing the same penalty that a jury had assessed against York.

■ Thereafter, on April 27, 1955 this court denied the application of York for release by way of writ of habeas corpus, or in lieu thereof the modification of sentence. Ex parte York, Okl.Cr., 283 P.2d 567. The Criminal Court of Appeals has repeatedly held that it has no jurisdiction to modify a sentence on petition for writ of habeas corpus. Only on appeal, where a record of the evidence taken at the trial would be before this court could it justify or have jurisdiction to modify a sentence. Perry v. Waters, 97 Okl.Cr. 17, 256 P.2d 1119; Ex parte Berryhill, 87 Okl.Cr. 48, 194 P.2d 214; Ex parte Moore, 88 Okl.Cr. 105, 200 P.2d 454; Hanks v. Waters, 95 Okl.Cr. 84, 240 P.2d 115.

Thereafter, on April 28, 1955, Adrian Wayne Burns in cases Nos. 22,283 and 22,284 in the district court of Oklahoma County, entered his pleas of guilty and on recommendation of the county attorney was

assessed a sentence of seven years' confinement in the State penitentiary in each case, sentences to run concurrently.

The writer in the above mentioned York habeas corpus case, Ex parte York, Okl. Cr., 283 P.2d 567, 572, wrote a concurring opinion. It seemed that the excuse that an appeal would have been futile by reason of the confession of York and hence a failure to perfect the record on appeal was useless, was a lame excuse in view of the fact that a large fee had been paid attorney Tant by the Burns family to defend not only Burns, but York, and a record disclosing matters set out in the petition for a writ of habeas corpus might have persuaded this court to modify the sentence imposed. At least, consideration might have been given to that subject. It was the opinion of this writer that a conflict in interest had developed between York and Burns on the one hand, and Hurt on the other, and counsel should have openly chosen between clients. Undoubtedly his loyalty to Hurt could not be questioned.

Such was the status of the cases of York, Burns and Hurt, when the appeal of Hurt was perfected to this court by the filing of casemade and petition in error herein on September 13, 1955.

We proceed now to a consideration of the petition for writ of error, coram nobis, and to the proceedings in the trial court.

■ The evidence discloses that the hearing for the writ took place before Judge William L. Fogg, the judge before whom the case complained of was tried, and that by agreement of the parties, Judge Glenn O. Morris and Judge W. R. Wallace, Jr., sat in an advisory capacity, though counsel for defendant insisted that they sit en banc. We approve the procedure followed.

■ The hearing commenced on February 27, and was completed on February 28, 1957 and the writ was denied. Counsel in open court gave notice of appeal to the Criminal Court of Appeals, and then filed a motion for rehearing, entitled "Motion for new trial", which was on March 4, 1957

denied, and counsel again gave notice in open court of his intention to appeal to this court, and was granted an extension of time to make and serve casemade to and including March 25, 1957, respondent to have three days thereafter to suggest amendments, casemade to be settled upon three days notice by either party. It was signed and settled March 19, 1957, filed in the office of the clerk of the trial court, withdrawn and filed in this court on March 19, 1957. We approve the procedure, and find that due diligence was used in having the record prepared and filed here necessary to give this court jurisdiction to review the action of the trial court in denying the writ of error coram nobis.

Counsel under date of March 27, 1957 filed in this court what was denominated "Application to Diminute Record and For Other Purposes", in which he sought to raise certain legal issues with reference to the Seventh Judicial District, of which Oklahoma County is a part, and by which it was claimed that defendant was entitled to have had his petition for writ of error coram nobis heard before a judge other than the actual trial judge, William L. Fogg, and wherein allegations were made for the purpose of showing the disqualification of Judge Fogg.

Brief in the case was filed in this court April 10, 1957, and after the case had been under consideration there was filed under date of April 26, 1957, a further application to further "diminute" the record, all of which would require a referral back to the trial court for hearing further evidence.

■ Judge Fogg filed an affidavit, denying in toto the allegations of the petition, and thereupon defendant filed a third application to diminute the record. We ordered the county attorney of Oklahoma County to respond, and thereupon the defendant filed a fourth instrument, denominated "Ancillary Application In Nature of Coram Nobis to Diminute the Record", containing allegations concerning body guard for the trial judge during trial, and

attempting to raise matters that were presumably within the knowledge of the defendant at trial and prior to disposal of appeal. The various motions were by this court denied and overruled on May 15, 1957. As said by this court in State ex rel. Mitchell v. Swindall, 33 Okl.Cr. 210, 241 P. 456, 458:

"The writ of error coram nobis is a common-law remedy, afforded on application to the trial court for the correction of errors of fact unknown at the time of the trial to the party seeking relief and to the court."

See also State ex rel. Attorney General v. Hurst, 59 Okl.Cr. 220, 57 P.2d 666; Hendricks v. State, Okl.Cr., 297 P.2d 576.

■■■■ Further we consider it within the discretion of a trial court whether or not he will require an officer to remain in the court room to maintain order and preserve the peace during the proceedings. Such could be for the protection of a defendant or litigant as well as the court.

However, we take judicial knowledge that two of the witnesses in the trial of Hurt (Burns and York), were then prisoners in the State Penitentiary at McAlester, and of necessity had to be conducted to and from the court room by officers, who would have to be near such witnesses at all times.

There never would be an end to the proceedings if defendant could keep on filing applications ad infinitum and go back and forth for further hearings. Judge Fogg prior to the hearing on February 27 and 28, 1957, gave counsel opportunity to disqualify him as provided by statute (22 O.S.1951 § 571), and Mr. White, counsel for defendant said: "I can't do it under the statute. I'm not in possession of facts enough to do it." [4]

■■■■ In one of the motions to diminute the record it is alleged that defendant has never violated any laws. It is said that, "your defendant is a man of small education, without learning in the law or legal terms, and without information or knowledge as to his constitutional rights." These are most amazing statements in view of the fact that at one place it is admitted that defendant was once convicted of a misdemeanor, and the trial record discloses that defendant received commissions from Gurley B. Lenn, who manufactured crooked gambling paraphernalia, for the sale of such equipment. And by his own admission as well as other evidence, it was shown that he for a time operated gaming tables for one of the American Legion Posts in Oklahoma City. In fact, defendant was an officer with the Oklahoma City police department for over eight years, and had been a constable of Oklahoma County about two years at the time he was charged with armed robbery. And it is prerequisite to qualify as an officer that he become familiar with the constitutional rights of citizens, and with ten years experience as an officer, defendant was bound to have had a practical knowledge of trial court procedure, and most assuredly knew that it was unlawful for any citizen, and particularly an officer, to operate gaming tables or sell crooked gambling equipment. From a consideration of the various instruments before us in these proceedings, we find the attacks made on Judge Fogg vicious and without any foundation, and without regard to

---

4. In Humphreys v. State, 129 Wash. 309, 224 P. 937, 940, 33 A.L.R. 78, where coram nobis was sought to secure a new trial for newly discovered evidence, the court laid down a principle that seems applicable to these applications to diminute the record. It was said: "It seems highly probable that in all cases of newly discovered evidence touching exclusively the merits of the issue actually tried and determined there can be no relief under any circumstances at the hands of the courts. To open the door to such inquiry would be to create a condition wherein the judgments of courts would have no finality, and thus be fruitful of greater evil than would flow from very rare cases of possible injustice, which would, however, not be beyond all cure, for, if injustice results from any such condition, it is readily curable, as far as human ingenuity can safely do, upon proper showing by a resort to the pardoning power."

Rule 10 of this court, 22 O.S.A. c. 18 Appendix.[5]

The Criminal Court of Appeals has never before granted a petitioner (where case pending in this court on appeal) permission to appeal to the trial court for a writ of eror coram nobis. And from the historical background we find that the writ was devised, not by legislation, but by the judiciary, as a suitable method to meet some of the extreme exigencies of justice. The procedure must of necessity, in our State, be by rule of court. Technicalities should not be favored. In Hendricks v. State, supra, we referred to our prior decisions and attempted to point the way, but cautioned that the writ would reach only matters not cognizable on motion for new trial, in arrest of judgment, or on appeal. And we said [297 P.2d 580]: "We can conceive of few situations where specific statutory provisions in this State would not afford relief."[6]

■ In considering the petition for writ of error coram nobis filed and heard in the trial court and the action of said court with reference thereto, we have recognized the generally accepted principle that the writ of error coram nobis or coram vobis lies only to correct errors of fact and may not be resorted to for purpose of correcting errors of law. 24 C.J.S. Criminal Law § 1606(5); Coram Nobis, Common Law-Federal-Statutory, With Forms, by Eli Frank, Newkirk Associates Inc., Albany, N. Y.;

People v. Kretchmar, 23 Cal.App.2d 19, 72 P.2d 243; 3 Am.Jur. 766; Mandell v. People, 76 Colo. 296, 231 P. 199; State v. Pyle, 173 Kan. 425, 248 P.2d 1086.

And by reason of this rule we have eliminated from consideration several legal questions attempted to be raised, and shall consider only the propositions advanced that in the first instance persuaded this court that a prima facie case had been stated, and justified us in referral to the trial court to resolve and grant or refuse to grant the defendant a new trial, depending on his producing or failure to produce, evidence sufficient to support the allegations of his petition.

■ In such a hearing before the trial court, it is the opinion of this court that the same principle would apply to the weight and sufficiency of the evidence to entitle the petitioner to a writ of error coram nobis, as would apply in any case heard by a court where a jury was waived[7], or by a jury[8]. That is to say, the court's findings as to the sufficiency or insufficiency of the evidence will not be reversed where there is any competent evidence in the record, together with the reasonable inferences and deductions to be drawn therefrom, supporting the court's findings.

This principle seems to have been recognized by the Supreme Court of Kansas in an early case, where it is said:

5. Rule 10: "No argument or motion filed or made in this Court shall contain language showing disrespect for or contempt of the trial court."

6. We have not heretofore approved rules or procedure. But in giving the various questions consideration, we feel that we know what the dissenting judge meant when in Anderson v. Buchanan, 292 Ky. 810, 168 S.W.2d 48, 55, he said: "Our decisions are in such confusion on the writ of coram nobis that no one can tell where we stand. In writing on the subject we have wobbled and bobbled like a lost raft at sea. But we are not alone, as other courts likewise seem to be without mast and compass when sailing this sea. Reference to the texts and reported decisions of foreign jurisdictions will show that other courts are in the same state of confusion. The writ of coram nobis appears to be the wild ass of the law which the courts cannot control. It was hoary with age and even obsolete in England before the time of Blackstone, and courts who attempt to deal with it 'become lost in the mist and fog of the ancient common law.'"

7. Wilkinson v. State, Okl.Cr., 273 P.2d 143; Crim v. State, 68 Okl.Cr 390, 99 P.2d 185.

8. Henderson v. State, 95 Okl.Cr. 342, 246 P.2d 393; Walker v. State, 89 Okl.Cr. 284, 207 P.2d 341.

"On an application for a writ of coram nobis, the court will not weigh conflicting evidence."

Dobbs v. State, 63 Kan. 321, 65 P. 658.

■ It is the rule in this jurisdiction that the burden of establishing the material allegations of a motion to suppress evidence or petition for a writ of habeas corpus or to set aside a judgment, is on the proponent of such motion or petition. Wirth v. State, 79 Okl.Cr. 59, 151 P.2d 819; Ex parte George, 83 Okl.Cr. 99, 173 P.2d 454; Ex parte Giles, 97 Okl.Cr. 292, 262 P.2d 909. Such rule would apply to a petition for writ of error coram nobis. 24 C.J.S. Criminal Law § 1606(c–8), and the allegations would have to be established by a preponderance of the evidence. Ex parte Lindley, Cal., 177 P.2d 918; In re De La Roi, 28 Cal.2d 264, 269, 169 P.2d 363. In the within case, it would be necessary to prove to the satisfaction of the trial court that the conviction had been established by perjured testimony produced by the prosecution with knowledge of its falsity.

The main theme of the petition for writ of error coram nobis that covers some 25 pages in the record is to the effect (1) that defendant's co-defendants Burns and York testified falsely against him to the knowledge of the prosecution, and that the prosecution promised them favors for such testimony, and stood by without protesting when they denied that the prosecution had promised leniency for their testimony, and that County Attorney Scanland in the first trial of Hurt where there was a mistrial, and assistant county attorney Martin in the second trial where there was a conviction, had falsely told the jury that they had not promised said Burns and York any favors, and would not intercede for them; (2) that Frank Massad, who was a witness against Hurt, would testify that he also had falsely disclaimed being Hurt's attorney, that Hurt had always denied his guilt to him; that the prosecution caused him to testify falsely, threatening to have him disbarred and placed him in jail from November 24, 1954 until January 6, 1955, and had him in terror until he nearly lost his mind.

Defendant established that in his testimony confessing his guilt and implicating Robert O. (Bob) Hurt, Adrian Wayne Burns denied before the jury that any agreement or promise to him had been made to persuade his testimony. It was also established that assistant county attorney Martin, in closing the argument of the case, did say of Burns:

"If he sees fit to enter a plea of guilty, I will not make a single recommendation on his behalf. Is that perfectly clear to everyone?"

It was further established that following the trial of Hurt, and on April 28, 1955, Joe Martin, in company with county attorney Scanland and John Connolly, Esq., attorney for Adrian Wayne Burns, went before Judge Clarence Mills, where Burns withdrew his plea of not guilty in cases Nos. 22,282 and 22,284, and Scanland did recommend to Judge Mills that a sentence of seven years be imposed in each case, the two to run concurrently.

It was established that in the first trial of Hurt, which resulted in a mistrial, county attorney Scanland had told the jury that even though Charles Edwin York, who had been convicted prior to Hurt and by the jury assessed punishment at 45 years in the State Penitentiary, had admitted his guilt and had testified against Hurt, that he would never go before the Pardon and Parole Board in his behalf.

It was established that Scanland after Hurt's conviction in the second trial where he did not participate on account of illness, Scanland had written the Pardon and Parole Board a letter in behalf of York. In this letter he said, in part:

"York gave a full written confession as to his part in the crime and was returned to Oklahoma City where he testified at the Hurt trial, concerning Hurt's part in the affair and it might be well to mention at this point that the jury apparently believed York's story, as it convicted Hurt."

It was established by the evidence of Dick Jones, Esq., former member and presiding judge of this court, that assistant county attorneys Joe Martin and Gene Hassman had appeared in his office in connection with the appeal of Charles Edwin York, which had not been decided, in an effort to get his 45 year sentence reduced by reason of his having testified in the Hurt trial on behalf of the State. Witness was of the impression that York had been promised aid for such testimony.

On cross-examination on the hearing for writ of error coram nobis, present county attorney Berry asked Judge Jones:

"Q. In the course of that conversation did you make the statement to me in substance that you did not know whether the consideration spoken of by Mr. Martin concerning York was made before the Hurt conviction or after the Hurt conviction? A. I don't know whether I understand your question.

"Q. Do you know of your own knowledge whether or not a deal was actually made between the prosecutor's office and the defendant York? A. No. Now if you'll read my opinion in the habeas corpus case, why, I recite in there that the county attorney's assistants recommended that we reduce the sentence. I haven't testified to anything here that I haven't written in the record."

It was further shown that inquiry was made after York's appeal had been decided and writ of habeas corpus denied, Okl.Cr., 281 P.2d 769; Okl.Cr., 283 P.2d 567, by Martin as to time for appeal to the Supreme Court of the United States; that attorney Carroll Samara filed the petition for writ of habeas corpus; that an assistant county attorney, thought to be Marion Opala, had at one time telephoned concerning an extension of time to file brief in support of the petition.

Carl Avery testified that in 1955 he worked for the King Law Brief Printing Company, and that he picked up from Mr. Marion Opala at the county attorney's office for printing a petition in behalf of Charles Edwin York for certiorari to the Supreme Court of the United States.

Dr. Waldo E. Stephens testified that he visited Frank Massad at the request of Massad's father while he was held in jail. He said that Massad was in protective custody and not subject to all the rules of some one who was confined to jail, and that he took Massad to his home one time. Witness denied that county attorney Scanland asked him to take Massad out, but stated that Massad's parents asked him to do this. He stated that Massad moved to California soon after the last Hurt trial; that he had corresponded with him, and that his address was Suite 1100 Law Building, 139 North Broadway, Los Angeles, California.

 Judicial notice is taken of the trial record which shows that during the pendency of the Hurt case Frank Massad was wounded by a would-be assassin at the front door of his home, and while in the hospital defendant Hurt visited him there and threatened him, and Massad asked for an armed guard. When he was discharged from the hospital he was held as a material witness.

Charles Edwin York testified that he was confined to the State penitentiary at McAlester He stated that he had testified against the defendant Hurt in his two trials. He was asked the leading question if his testimony was false, and answered: "Yes, sir." Also in response to other leading questions he answered, "Yes, sir", to the suggestion that the county attorney and his assistants had made many trips to McAlester to persuade him to give his testimony. And that they promised him that for such effort they would secure a reduction in his sentence. He was asked the further leading question:

"Q. Will you state to the judges whether or not you were told by the county attorney's office to deny that promise when you testified? A. Yes, sir."

Witness admitted on cross-examination that he had on September 29, 1955 signed an affidavit for his attorney Dave Tant concerning testimony in which Tant sought a new trial for Hurt on the ground of newly discovered evidence.

On re-direct examination York was asked:

"State whether or not you told the county attorney's office and its various members during their negotiations with you for your testimony that you knew nothing connecting Bob Hurt with this crime?"

The county attorney objected to this question as leading, but was overruled. York answered:

"Indirectly, sir."

Defendant failed to produce Frank Massad whom he alleged in his petition would swear to matters alleged and set out that were extravagant if defendant had not been given the information by Massad. In fact, if he could have proven the things he alleged Massad would swear to, such would have been most damaging to the State and would probably have resulted in the trial court granting the writ. He produced Massad's ex-wife, Jeanne Brakebill, but her testimony threw no light on the questions at issue.

The State offered the testimony of a number of witnesses.

Percy Borden testified that he was a police officer with the Oklahoma City Police Department, and had participated in the York, Burns and Hurt matters in 1954 and 1955, and that following York's conviction he had visited with him in the penitentiary at McAlester right after Hurt had been charged. He said that he accompanied Roy Burns, brother of Adrian Wayne Burns. He said that York had sent him word that he wanted to see him. Said he:

"A. He advised that he had learned of Wayne Burns' confession and the subsequent charge against Mr. Hurt. And in substance he wanted to know what he could do to help himself; if I could help him.

"Q. He wanted to know if you could help him? A. Yes.

"Q. What reply did you make to Eddie York? A. Sir?

"Q. What reply did you make to Eddie York? A. I advised him that I would—I had no authority and had not been advised to make him any offer, and I couldn't help him any, but I would be glad to pass the word to Mr. Scanland. I thought that he was the party that he should—

"Q. (Interrupting) Did you return to Oklahoma City and do that? A. I did."

Granville Scanland testified that he was county attorney of Oklahoma County at the time of the two trials of the defendant Robert O. (Bob) Hurt. He had been succeeded in office by James W. Bill Berry. He said that he conducted the first trial of Hurt that resulted in a hung jury, and that he was confined to the hospital at the time of the second trial, and his assistant Joe Martin conducted that trial. He said that he had read defendant's petition for a writ of error coram nobis. He was asked:

"Q. There is an allegation, or several allegations, in that application stating in substance that you, personally elicited from Charles Edwin York false testimony to be used against Mr. Robert O. (Bob) Hurt in his trial upon the charge of armed robbery; is that allegation true or false? A. It is not true. It is false."

Witness said that he was acquainted with Charles Edwin York and Wayne Adrian Burns who were likewise charged with robbery with firearms growing out of the same crime Hurt was charged with. He further testified:

"Q. Did you ever elicit any testimony from Adrian Wayne Burns which was false to be used against Bob Hurt? A. I did not.

"Q. Did you at any time ever make any deal with Adrian Wayne Burns wherein you promised him any special

consideration in return for his testifying against Bob Hurt? A. I did not.

"Q. Did you as county attorney, take a written statement from Adrian Wayne Burns wherein he implicated Robert O. (Bob) Hurt in the same crime? A. Yes sir, I did.

"Q. Would you please describe to the court the circumstances surrounding, both previous to at the time of, and after the taking of that statement? A. Yes. At that time York and Burns were charged jointly with the—with that crime. They were the only two charged at that time. Some two months, I would say approximately two months, before the taking of the Burns statement the case was set for trial. They were both, you understand, charged together under one number. That case was set for trial, and at that time a severance was demanded and granted, and upon the granting of the severance the State elected to try Eddie York. York was tried in one of the district courts here and I think on the following, possibly two months later, the Burns case was set on the trial docket. And a day or two or three, I don't recall, possibly one day before the Burns case was set for trial, Mr. John Connolly, an attorney here, advised me that he had just then been employed to represent Burns and that his client had decided to make a confession and wanted to give a written statement. I think that answers the question, Mr. Berry. If it doesn't we'll—(pause).

"Q. All right, sir. You say you elected to try York first after the severance was granted; is that correct? A. That's correct; yes, sir."

* * *

"Q. Now the record shows that on April 28, 1955, the defendant Burns appeared before District Judge Clarence Mills, withdrew his plea of not guilty and entered a plea of guilty in cases 22,283 and 84, and that he was sentenced to seven years in each case, to run concurrently on the recommendation of the county attorney. Were you present at the time that plea was made? A. Yes, sir.

"Q. Would you please explain the circumstances of that recommendation? A. I'll go back a little bit.

"Q. Go ahead. From the time you first considered it. A. Some time, within a day or two, as I recall, within a very few days at least, after Adrian Wayne Burns gave his statement, his confession, in which he implicated Bob Hurt, a charge was filed against Hurt. Later on, in due course, the Hurt case was tried, and tried the second time. I think, perhaps, from the time of the Burns confession until the second Hurt case was tried, perhaps, close to a year had elapsed. Burns did testify in both those cases on behalf of the State of Oklahoma. His testimony in those cases was substantially the same as was given to me in his written confession. After the second trial of Bob Hurt was finished, I then entered into negotiations with Mr. Connolly, the attorney for Burns, as to any recommendation that might be made. We had several conferences. I don't recall how many. And as a result of those conferences, my reviewing the case, my considering the benefit that Adrian Wayne Burns had been to the State of Oklahoma, my consideration of the fact that Burns had then spent some year and a half or so in the county jail, upon consideration of all those things, I finally agreed with Mr. Connolly that I would—that if Burns would go before the court and plead guilty, I would recommend seven years. That I did.

"Q. All right, sir. Now there is another allegation in this petition that in recommending the seven years you likewise recommended that he be given credit for 584 days' jail time on the seven years; is that true? A. That

is not true. That is not in the record and that was not done, and he did not get credit on the seven-year term for any jail-time he had done. * * *"

"Q. Now then, Mr. Scanland, after Eddie York's conviction and his incarceration in the penitentiary at McAlester, did you visit him at the penitentiary? A. I did, yes.

"Q. Now will you please recite for the court the circumstances of that visit, or why you went down there and what you did when you got there, and so forth. * * * A. After talking to Percy Bordon, detective, I then made a trip to McAlester to see Eddie York. The reason I went down there is because of the conversation that I had had with Percy Borden, the detective. * * A. I did visit Eddie York in the penitentiary, and that was within, I think, as I recall, it was within a month after I filed on Bob Hurt. I talked to Eddie, I guess, for an hour down there. Am I permitted to detail that conversation?

"Q. I am going to ask that you do. A. All right. Eddie York told me then that he was ready to give a complete confession; that he had lied in his own behalf at his trial; that he did participate in it; and that Bob Hurt was the master-mind; and that he wanted to give a complete written confession. I was not equipped that day. I didn't take a reporter or a stenographer with me, and I told Eddie that I would return in a short time, within a few days or a week, with a— with a reporter and would take his statement. Eddie asked me, among other things, what I could do for him. And I said, 'Eddie, there is nothing I can do for you now. You are too late. You are convicted, and there is just nothing I can do about it. Eddie told me also that he had been double-crossed; that Bob Hurt was supposed to furnish him his lawyer, his alibi witnesses; and that he hadn't done it; and that he wanted to bare his soul and tell the truth for whatever it might be

worth to him at any time later. Pursuant to that, I went back to McAlester with a reporter, Mrs.—she has married since then. She was Mabel Crane. Mrs. Taylor, yes. She is a professional reporter. I went down there some few days later and at that time Eddie York gave a complete statement confessing his part in the crime, repudiating the testimony that he had given in his own behalf at his own trial, and corroborated Wayne Burns in the part that Bob Hurt had played in the Lenn torture robbery. That was taken in shorthand by the reporter, Mrs. Taylor. It was later reduced to typewritten form and taken back to Eddie York, and signed. I don't think I went back. I don't think I went back when it was taken back to him. I think one of the other men in the office went back and took it down there when he signed it."

Witness further testified that the statement bore date of October 2, 1954.

On cross-examination witness Scanland said that in obtaining the statement of York a stenographer was used; that he asked the questions and York dictated the answers. He said that the statement was taken a day or two before the Burns trial was stricken from the docket. He said that Burns' attorney was going to plead his client guilty later on. He said that he had agreed with counsel to make some kind of recommendation when Burns would plead guilty.

Witness further said that he had appeared before a State Bar Committee that was considering disbarment proceedings against Frank Massad; that he appeared at Massad's request; that he had never learned of the results.

On re-direct examination Mr. Scanland was asked:

"Q. Mr. Scanland, going back to the time that Burns made his confession, was any specific agreement reached or any specific deal as to time or anything else? A. There was not. The only deal I had with Mr. Connolly was that if Burns wanted to come down and tell.

the truth, and I thought he was telling the truth; and that later if he went on the witness stand in the event I charged Bob Hurt, and if he then told the truth, I would take all of that into consideration after it was done, and make whatever recommendation I thought was proper."

It was agreed between counsel that both York and Burns had testified that they had not been promised anything by the county attorney for their testimony.

John Connolly testified he was an attorney and that he had represented Adrian Wayne Burns and that he discussed with county attorney Scanland the giving of a statement by Burns concerning the crime with which he was charged. He testified:

"Q. (By Mr. Berry) Were you able to obtain any specific deal from Granville Scanland in return for a confession from Adrian Wayne Burns? A. I was not. Certainly after Burns employed me; that is, the family employed me, and after a conference with Burns, I did talk with the county attorney. I certainly attempted to make—to clarify my position and to see if I could get some recommendation on the basis of him making a statement.

"Q. And before he made this statement, did you get any commitment from the county attorney's office? A. No, Mr. Scanland would not commit himself on it."

On cross examination witness was asked by counsel for defendant:

Q. Mr. Scanland told you that if your client would make that statement and testify against Bob Hurt and it would stand up, he would make a recommendation on his plea of guilty, didn't he? A. Not exactly that way, Sid. * * * I went to Mr. Scanland's office and had a long discussion with him in which I—I informed him that the man wanted to make a statement, Burns wanted to make a statement, and would he give Burns any consideration. I tried to pin him down to a cer-

tain number of years, and he said he would not. Now he said, 'if he makes a statement, and if I believe it, and if he does testify in this case, certainly I will consider giving him some consideration.' I relied on that, and the historical fact that courts and county attorneys always do that."

Marion Opala testified that he had been an assistant county attorney under Granville Scanland. He denied that he wrote the brief for York in support of his petition for a writ of habeas corpus, or on appeal. He denied preparing any brief for or against York. As to his conversations with the then presiding Judge of this court, he testified:

"A. I had two telephone conversations with Judge Jones, or perhaps three, while I was serving as assistant county attorney. And all of these telephone conversations pertained to the State's answer brief in the appeal of Bob Hurt. These conversations were had with Judge Jones sometime in the early part of January, 1956, I believe. In as much as the attorney general requested the county attorney's office to assume the burden and responsibility for the appeal of Bob Hurt, I called upon Judge Jones several times with reference to, I believe, granting an extension of time in which to file the State's answer brief in the appeal of the defendant herein, Bob Hurt."

Granville Scanland was re-called as a rebuttal witness for defendant Hurt and was asked why he had dismissed perjury charges against Frank Massad. He said that it was because State's witness Phoney Jones had told three different stories.

Witness further testified that he did not make York any promises of any sort. He said that he told him that there was nothing that he could do for him; that it was too late; that he was already convicted.

In reviewing the evidence in this case there are two things that stand out "like a sore thumb", to use a not very nice expression, and which add nothing to the

building up of respect and confidence in the integrity of prosecuting officers. The first is the statement by Mr. Scanland in the first trial of Hurt that he would never appear before the Pardon and Parole Board in behalf of York. There was a mistrial. York testified in the second trial for the State. His attorney in effect abandoned his appeal, as has been recited.

Any person of any intelligence whether he was promised help or not promised help would certainly expect help if any could be given, if he did tell the truth and co-operate with the officials; and it would be a strange and unusual prosecuting official who would not give consideration to such aid. For an attorney to advise the jury under such circumstances that he positively will not do something that future conditions might prompt him, even make it his duty in all good conscience to do, as it turned out in this case, is just not understandable. There was no necessity in making such statement. The fact is that Mr. Scanland did write the Pardon and Parole Board in behalf of York, and while the fact that York testified for the State justified this, the record is that the statement to the jury proved to be ill-advised and not lived up to.

The same may be said about Mr. Martin's statement to the jury as to Burns.

█ County Attorney Scanland and Mr. Martin appeared before Judge Mills and recommended the amazingly low sentence of seven years for Burns, who admitted to torturing the robbery victim with the red hot curling iron, though he swore that Hurt suggested the method of torture. This in the face of the fact that York, the flunky in the case, had received 45 years, as did Hurt. One of the reasons given for the low recommendation was that Burns had already spent over a year and a half in jail. It now develops from the record that the Pardon and Parole Board has now given Burns credit for the jail time, and he is already out of the penitentiary. The Pardon and Parole Board may be expected to give consideration to credit for jail time, and the trial court, in view of the policy

of the Board, should not give consideration to time spent in jail awaiting trial, in fixing sentence. If there are inequities in the matter of assessment of penalties among the co-defendants that is now a matter that may receive the attention of the Pardon and Parole Board, giving attention to the nature of the crime for which conviction had.

█ As much as we condemn the careless and ill-advised statements to the jury by the prosecutors, this would not entitle defendant to a new trial unless the county attorney had in the face of such statements induced York and Burns, one or both, to turn State's evidence by reason of promising them aid. As indicated in People v. Savvides, supra, there is a vast difference in a witness turning State's evidence in the hope of leniency, and where he had been promised leniency, and when the question was raised deceived the jury. In Savvides the prosecuting attorney had in court admitted that he had made a deal, but stood mute when the witness denied it before a jury. The facts were admitted. Here County Attorney Scanland swears that he made no promises. As to Burns, he is corroborated by John Connolly, Esq., Burns' attorney. And as to York, York was already convicted. York, who admits to perjury and whose history as shown by the trial record is anything but good, says that he was promised help on his appeal. Whether the help attempted by the County Attorney's office was in gratefulness for the co-operation of York in the two trials or by reason of a promise, was the question. The issue has been resolved against the defendant by the trial court, and there being evidence to support the judgment of the court denying the writ of error coram nobis, said judgment must be and is affirmed.

BRETT, P. J., and NIX, J., concur.

NIX, Judge (concurring).

Though I am in accord with the POWELL opinion, I feel compelled to comment upon certain questions of law presented by this case, which I deem to be of the utmost importance to our jurisprudence.

The urge to comment on this matter is driven by the desire to alert the courts of the injustice that might prevail if an attorney betrays his client's confidence and uses against him, that which was believed to be privileged. Though the rule may have been applied in a case where the crime charged was heinous in its conception and fiendish in its execution, once the rule is adopted it may well haunt the court in future cases, thereby opening the door for great wrongs to be done by those who would discard ethics of the profession of law.

Plaintiff in error contends that the court was in error by permitting Frank Massad, an attorney, who Hurt contends represented him during early stages of the case, to testify as to matters related to him by Hurt. It appears from the record that Massad did serve as attorney for Hurt but was later let out—not fired, but as put by Hurt "just kinda eased him out." Some time later, Massad placed upon himself a tape recorder concealed beneath his clothing, called Hurt. They met, rode around in a car, stopped and had a sandwich. During all this time, unknown to Hurt, the conversation was being recorded by Massad, Hurt's former attorney. It is obvious from the transcribed recording that Massad propounded many questions of a surreptitious nature and thereby elicited from Hurt conversation which he desired. During the trial of Hurt, Massad was permitted to testify as to the contents of the recording which in the opinion of the writer was most damaging to the defendant. After Massad testified and identified the recording, it was edited and introduced in evidence. Massad denied being the attorney for Hurt at any time, but an examination of the record can leave little doubt that he was acting as attorney for Hurt during a part of the time before and after charges were filed against the defendant. Several witnesses, including a court reporter, newspaper man, and district judge testified Massad represented Hurt on the 18th of May, 1954, In re Habeas Corpus of Hurt arising out of these charges. An attorney, Wayne Wheeling, who officed in

the same suite with Massad, testified that Mr. Hurt was a frequent visitor to Massad's office and he knew Massad was acting as Hurt's legal advisor. Hurt testified he had 75 to 100 conversations with Massad, considered him his attorney and at the request of Massad purchased a recording device for Massad to use in connection with his case. That Massad represented him at arraignment and to make bond. Massad was listed on the docket in Justice court as one of the attorneys for Hurt. Though Massad denied this, the evidence was clearly to the contrary. Even excerpts from the tape recording elicited by Massad from Hurt verified attorney-client relationship. (CM 702, date Oct. 20, 1954)

"Massad: Have you talked to Dave about them subpoenaing me?

"Hurt: Oh, he talked to me a half a dozen times about that. But I don't know what angle he's shootin', but he told me you * * * sure couldn't testify.

"Massad: Well, ah, I can't see it either, Bob. Now look, I know the law says this: that a privileged communication between attorney and client, when the privilege is invoked, can be made public only by the client, and not by the lawyer."

Surely in view of this statement recorded by Massad, and introduced by the state, Massad's position, even as late as October 20, 1954, was made clear as Hurt's attorney, to the extent, that the communication was privileged in his opinion. However, this matter was passed on by the trial judge, then said cause was appealed to this court and the matter affirmed and consequently res judicata and cannot be considered by this court under coram nobis proceeding. Your writer was not a member of the court at the time the case was affirmed. I do not agree with the court's opinion in affirming the appeal as far as Massad's testimony being competent; undoubtedly it was a deciding factor in the minds of the jury. I definitely think it was privileged communication and should have been excluded.

To have held otherwise in my opinion, did violence to the time honored principle of confidential relation between attorney and client. If the dignity of the law of profession is to be preserved, a client who has become involved with the law must feel at liberty to advise and counsel with an attorney in regard to said infractions and to communicate with him freely, with the utmost confidence and assurance, that the communications cannot be divulged as evidence without the consent of the client. It has long been the duty and business of those engaged in the practice of the profession of law when engaged and relied upon for that purpose, to counsel with and give advice to those who have been charged with an infraction of the law, and to enable the attorney to properly advise and represent the client in court, or when prosecutions are threatened, it is conducive to the dignity of the law profession, and to the administration of justice, that the client shall be free to communicate to his attorney, all the details and facts directly or indirectly pertinent within his knowledge, to his attorney and that he must be cloaked with greater protection than the confidence vested in his attorney; but in addition thereto be assured under the law that said communications made by him shall not be used to his prejudice. The seal of silence is upon it, subject to be broken, by the consent of the client only.

The court justified its opinion upon the theory that though Massad, during parts of the case, was Hurt's attorney, the relationship of attorney and client had ceased to exist at the time Massad, through use of artifice, recorded the conversation between him and Hurt. I feel better law would have prevailed had the court followed the law handed down by many other jurisdictions and recited in 58 Am.Jur. § 467:

> "Ordinarily the protection given by the law to communications made during the relationship of attorney and client is perpetual and does not cease with the termination of the suit, nor is it affected by the party's ceasing to employ the attorney and retaining another, or by any other change of relations between them, or by the death of the client. The seal of the law once fixed upon them remains forever, unless removed by the party himself in whose favor it is there placed."

To your writer this language is clear, simple, just and right, but unfortunate as it may be, the court has adopted the contrary and the hand that writ has moved on and this court as it is now composed is helpless to review the matter under the pleadings before us. We have done considerable research on coram nobis as Judge POWELL'S decision so amply reflects, and are all in agreement with the limitation of that which can be considered by way of coram nobis.

The authorities contend the ancient remedy of coram nobis, though having a definite place in keeping with innumerable decisions, by the courts in which due process rendered, has been affirmed and expanded as one of the bulwark of American liberty, yet it was never intended to provide litigants with a substitute for appeal, a new trial or other statutory remedy, nor can it be used for the purpose of correcting errors of law. In its early usage, criminal cases were not the usual meter of this writ. However, the courts in their cautious preservation of human liberty have been most receptive to remedies contemporary or ancient in order that justice might be best served. However, coram nobis must not be the instrument by which litigation might be drawn out over endless periods by subjecting the judiciary to the task of reviewing matters time and time again that have long since been res judicata.

I am in full accord with the opinion of Judge POWELL as to the denial of relief upon the issues which we are permitted to consider under the writ of coram nobis. However, I trust the matter relative to privilege communication between attorney and client will be reviewed by the Supreme Court of the United States and clarified.