**Burleson L. GIPSON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 2674.**

Supreme Court of Alaska.

March 3, 1978.

---

Richard D. Savell, Aschenbrenner & Savell, Fairbanks, for appellant.

Stephen E. Branchflower, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

BURKE, Justice.

The main issue in this appeal is whether lack of counsel at a preliminary hearing unconstitutionally tainted appellant's subsequent grand jury indictment, trial and conviction for assault with a dangerous weapon in violation of AS 11.15.220. The second issue is whether the superior court erred in denying a continuance.

Appellant, Burleson L. Gipson, was arrested on March 27, 1975, after he allegedly beat one Carolyn Weber with a pool cue during an altercation at the Flame Lounge in Fairbanks, Alaska. On April 2, 1975, six days after his arrest, Gipson was brought before the district court for a preliminary hearing. Judge Mary Alice Miller, upon being informed by Gipson that he had been unable to contact his attorney, recessed the hearing for five minutes to call counsel herself. When court was reconvened Judge Miller announced that she had been unsuccessful. At the urging of the state, she then ordered the hearing to proceed. At its conclusion Gipson was bound over to answer to the grand jury. Judge Miller also raised Gipson's bail from $1,000 to $5,000.

On April 10, 1975, the Public Defender was appointed to represent Gipson. On April 11, 1975, the grand jury returned an indictment charging him with the crime of assault with a dangerous weapon.

On May 6, 1975, Gipson's attorney filed two motions on his behalf. First, counsel moved to dismiss the indictment. Second, he moved to suppress all evidence of the testimony given by Gipson at his preliminary hearing, and any additional evidence gained as a result of that testimony. Both motions were based upon the fact that Gipson was not given an attorney at that hearing. Superior Court Judge James R. Blair heard argument on the motions on May 13, 1975. At the conclusion of those arguments, he ordered that a second preliminary hearing be held in an effort to cure any defects arising out of the first preliminary hearing. Otherwise, he reserved decision.

The second preliminary hearing was held on May 16, 1975, before Judge Blair. At that hearing Gipson was represented by an attorney. Again, the court found that there was probable cause to believe that the crime of assault with a dangerous weapon had been committed and that it was committed by Gipson.

On May 29, 1975, just prior to trial, Judge Blair denied Gipson's outstanding motion to dismiss the indictment. At the same time Judge Blair indicated that he would grant the motion to suppress. After trial by jury, Gipson was found guilty as charged. This appeal followed.

I.

Gipson first contends that the trial court erred in refusing to grant his motion to dismiss the indictment, claiming that dismissal was the only proper remedy for violations that occurred at his first preliminary hearing. Although that contention is supported by several arguments, all of them relate to prejudice flowing from the district court's denial of his right to counsel.

At the outset, it must be noted that the state concedes error on the part of the district court in failing to assure that Gipson had the benefit of either retained or appointed counsel at the first preliminary hearing. With admirable candor it admits: "In demanding an immediate preliminary hearing in the absence of defense counsel, the State contributed to the court's error." Thus, the question of Gipson's basic right to counsel is not in dispute. The only issue is whether the violation of that right, an admitted error, entitled him to have his indictment dismissed. If so, his conviction must be reversed.

In determining whether such error merits reversal, we are first required to examine the nature of the right violated. Where the right is one guaranteed by the Constitution of the United States, the court

must be able to declare that it was harmless *beyond a reasonable doubt* before it can be held harmless. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). As to non-constitutional errors a less exacting standard applied. *Love v. State,* 457 P.2d 622 (Alaska 1969); Rule 47(a), Alaska R.Crim.P.

Rule 5.1(a), Alaska R.Crim.P., specifically provides:

> The defendant is entitled to be represented by counsel [at his preliminary hearing]. If the defendant cannot secure counsel, counsel shall be appointed for him.

The right set forth in Rule 5.1(a) is, however, more than a matter of local procedure. It is also a right guaranteed by the Sixth Amendment to the United States Constitution. *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). Thus, the standard of *Chapman v. California, supra,* applies. Under that standard, we hold that the error in this case was harmless beyond a reasonable doubt.

■ Initially, Gipson argues that an attorney might have been able to expose "fatal weaknesses" in the state's case, making it unlikely that probable cause would have been found. Thus, he contends, the state would have been "disinclined to present the case to the grand jury." While it is clear that Gipson was entitled to counsel at the preliminary hearing, it is pure speculation to surmise that somehow the presence of counsel would have prevented later presentation of the case to the grand jury and return of the indictment. We find no merit in appellant's first argument.

■ Gipson next points to the fact that his bail was increased from $1,000 to $5,000 at the conclusion of the first preliminary hearing, causing him to remain in custody until his trial. On the theory that counsel might have prevented the increase in bail, he now argues that he was thus prejudiced in that had he remained free he might have located witnesses who could have contradicted the state's evidence that he was Weber's assailant.

In making this argument, Gipson ignores several important facts. A full bail hearing was held before Judge Blair on May 16, 1975, at which time Gipson was represented by counsel. Bail was thereupon continued at $5,000. Moreover, Gipson was represented by able counsel from April 10, 1975, through the time of trial. There is simply nothing in the record to suggest that Gipson's release on a lesser bail would have been ordered had counsel been present at the conclusion of the preliminary hearing, or that if Gipson had somehow gained his release that that would have increased the likelihood of locating additional witnesses. In short, Gipson has failed to demonstrate how the district court's error, in forcing him to proceed without counsel, put him in any worse position than that of any defendant unable to post bond while awaiting trial. Again, we find his argument to be without persuasive force.

■ After being asked if he wished to do so by Judge Miller, Gipson testified in his own behalf at his first preliminary hearing. However, he was not warned of his right to remain silent before he testified. Gipson's next argument is that this clear violation of his Fifth Amendment right against self-incrimination, aggravated by the denial of his Sixth Amendment right to counsel, requires a reversal. This argument, like one that we have already disposed of, is based, at least in part, upon a theory that his illegally obtained testimony "may well have affected the decision of the prosecutor to take the case to the grand jury and therefore the indictment should have been dismissed." We regard this argument, like the earlier one, to be without merit in that it is entirely speculative. Given the other evidence in the case, we think it beyond a reasonable doubt that the prosecutor would have asked for an indictment even if Gipson had not testified. Moreover, contrary to appellant's further contention, there is nothing in the record to suggest that any of the evidence presented to the grand jury, to the court at the second preliminary hearing, or to the jury at trial, was a product of Gipson's testimony at the first preliminary hearing. The superior court correctly suppressed the

evidence of Gipson's own testimony and we can find no indication of a causal connection between that testimony and the other evidence subsequently produced by the state. Such being the case, Gipson has failed to demonstrate that reversal is required on these grounds.

Gipson's next argument relates to the evidence identifying him as Weber's assailant. At the first preliminary hearing the only witness to positively identify Gipson as being directly connected with the assault was Craig Richard, the doorman at the Flame Lounge. Richard was also the only witness to make such an identification before the grand jury. Later, at trial, he repeated that identification. Yet, at a lineup arranged by Gipson's attorney at the time of the second preliminary hearing, Richard was unable to identify Gipson. Claiming that Richard's identification testimony was solely the product of impermissible suggestion at the first preliminary hearing, Gipson now argues that his indictment and later conviction was "based upon the unreliable, tainted fruit of a primary illegality, violating [his] constitutional right to due process."

The state concedes that the identification of Gipson at the first preliminary hearing was improper on two grounds: (1) the defendant was entitled to have counsel present, as we later held in *Blue v. State*, 558 P.2d 636 (Alaska 1977), and (2) the identification was made under circumstances that were unduly suggestive in that Gipson was the only black man in the courtroom. However, the state argues that these errors were harmless because there was sufficient untainted evidence of Gipson's identity presented to the grand jury and later to the trial jury to support the indictment and conviction. We agree with the state's position.

Four witnesses appeared before the grand jury: Bennett Clark, a cab driver; Geneva Steinberg, a dancer at the Flame Lounge; Richard Lynn Cummings, a Fairbanks police officer; and Craig L. Richard, the doorman at the Flame Lounge.

Bennett Clark testified that during the early morning hours of March 27, 1975, a black man of medium or slim build, wearing a light colored jacket or shirt and dark trousers, entered his cab which was parked across the street from the Flame Lounge. According to Clark, the man instructed him to drive to a house located at 17th and Mary Ann Streets. Upon arrival at that location the man instructed Clark to wait, stating that he was going to change clothes and go back to town. Clark further testified that after a short period of time a man that he believed to be the same man returned to the cab wearing light blue clothing. According to Clark, the man "said he was going to go back to the Flame." On the way back Clark stopped when he observed a police car with its red light on. Clark stated that when he commented aloud that he was probably exceeding the speed limit, his passenger replied: "No, they probably want to question [me] about a fight." A police officer removed the passenger from the cab and after a short interrogation released him. Clark then drove the man to the Flame Lounge. When asked if he observed the man to be carrying anything, Clark replied in the affirmative, stating: "It was a camera or radio."

Geneva Steinberg, who did not testify at the first preliminary hearing, stated before the grand jury that she had observed the assault and that the assailant "looked very similar" to Gipson although she could not say with certainty that it was he. Steinberg described the assailant as a black man, not too tall and fairly slender. Following the assault she observed the man leave the premises.

Officer Cummings testified that he stopped the cab driven by Bennett Clark, talked to the passenger and identified him as Burleson Lowell Gipson. Cummings further testified that Gipson matched the physical description given to him by the witnesses to the assault of the assailant, in terms of appearance, size, weight and height. Gipson was questioned by Cummings but, because the clothing that he was wearing did not match the description of the clothing worn by the suspect, he was released.

Craig Richard testified that he was on duty as doorman at the Flame Lounge at the time of the assault. He described the assailant as being a black man between 5 feet 10 and 5 feet 11 inches tall, weighing 160 to 170 pounds, and wearing a white shirt and black pants. Richard further testified that after the assault the man left the premises. Later that evening he observed the same man again in the Flame Lounge wearing blue clothing. Richard stated that after the man returned he "started taking pictures and started playing grab-ass with the girls in there like nothing ever happened." When further questioned about the matter of pictures, Richard stated, "He had a camera with him."

The foregoing evidence of identification, which we consider overwhelming, had an "independent source" from the tainted in-court identification which occurred at the first preliminary hearing. *McCracken v. State,* 521 P.2d 499, 504 (Alaska 1974); *United States v. Wade,* 388 U.S. 218, 241, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149, 1165 (1967). Accordingly, we believe the defective line-up procedure conducted at the first preliminary hearing was harmless in its effect before the grand jury. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Love v. State,* 457 P.2d 622 (Alaska 1969); Alaska R.Crim.P. 47(a). Thus, the superior court did not err in refusing to dismiss the indictment.

Concerning the testimony presented at trial, it is true that the state called essentially the same witnesses that testified at the first preliminary hearing and before the grand jury. However, there was additional testimony from Cindy Hutchins, an eyewitness. Hutchins had known Gipson and had socialized with him prior to the assault. Hutchins testified that Gipson had an argument with Carolyn Weber earlier in the evening at the Flame Lounge at which time Gipson told Weber that he was going to "wire her mouth." Following this confrontation, she observed Gipson go to the rear of the lounge, pick up a broken pool cue and approach the victim. Hutchins further testified that Gipson then struck Weber on the head two or three times with the heavy end of the cue, punched her with his fist, and then kicked her after she fell to the ground. Hutchins also stated that she had a good vantage point from which to observe the defendant and his assault on Weber.

Such evidence was entirely untainted in that it was isolated from both the first preliminary hearing and the later grand jury proceedings. Such being the case, there was more than sufficient evidence of Gipson's identity to support the conviction entirely apart from any identification that might have been tainted by the errors occurring at the first preliminary hearing. In any event, viewing the record as a whole, we are convinced that such errors were harmless beyond a reasonable doubt insofar as they might have influenced the jury in returning a verdict of guilty.[1]

## II.

The second part of this appeal concerns the superior court's refusal to grant Gipson's motion for a continuance of his trial.

The trial was scheduled to begin on May 27, 1975, eleven days after the second preliminary hearing. On May 20, 1975, Gipson moved for a one week continuance, citing three reasons in support of his motion:

1. Additional time was needed to investigate the "surprise" eyewitness, Cindy Hutchins, who first testified at the second preliminary hearing, and to follow up leads on any possible witnesses that might come to light.

2. The defense needed additional time to obtain a transcript of the second preliminary hearing from the court's transcript department.

3. Additional time was needed to allow Gipson's attorney to review the tape recordings of the first preliminary hearing and the proceedings before the grand jury, both of which had been lost after they were loaned to the court by Gipson's attorney.

1. *See Moore v. Illinois,* —— U.S. ——, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977).

Gipson's motion was denied, although his trial did not actually begin until May 29, 1975. Gipson now argues that the court abused its discretion in denying his request, contending that he was forced to go to trial without adequate time to prepare his defense and without the tools he needed to effectively cross-examine the witnesses against him, *i. e.,* a transcript of their earlier testimony.

The circumstances justifying the continuance of a criminal trial were discussed by this court in *Green v. State,* 544 P.2d 1018 (Alaska 1976). There we stated:

> We . . . approve of the practice of granting continuances, in such matters, *only when the request for such is supported by evidence showing good and sufficient cause, and then only for such time as may be required in the interest of justice.*

544 P.2d at 1023 (footnote omitted) (emphasis in original).

In this case, we hold that it was not error to deny the continuance.

■ The record reflects that at the time of trial Gipson's attorney had duplicate tapes of the official electronic recordings of both of the preliminary hearings and the proceedings before the grand jury. In addition, he had prepared a partial written transcript of the recorded testimony and had coded that testimony for use with his own notes. Most important, before the trial started the superior court clearly indicated that upon request counsel would be furnished with a typed transcript of any portion of the electronic record that he might require for purposes of cross-examination. When the issue was called to the court's attention, the following exchange occurred:

> THE COURT: Well, I think you'll probably be able to handle it as the direct examination is proceeding. If you come across material that you think should be transcribed for your cross examination, just make that known . . . ordinarily there's some period of time between direct and cross. And if you need one or two lines that you've already got coded,

why, my secretary can take care of that. She used to run that transcript office down there, and she's got the materials. So we can get it in transcript form.

> COUNSEL: Okay. Fine.

Counsel, after thus agreeing to proceed in the manner suggested by the court, made no further request that any portion of the electronic pre-trial record be transcribed. Moreover, during the trial he appeared to have no difficulty in fully cross-examining the state's witnesses. Under these circumstances, we fail to see how Gipson was prejudiced by the lack of a full, typed transcript.

■ Gipson's remaining contention, that he was entitled to more time to prepare, is also without merit. The Public Defender was appointed to represent him on April 10, 1975. At the omnibus hearing, held on May 9, 1975, the defense was given the names and statements of all of the state's witnesses, including that of Cindy Hutchins. In addition, the defense had the recorded testimony of those witnesses appearing before the grand jury and at the two preliminary hearings. Other than the bald assertion that he needed more time to prepare, Gipson made no showing of any specific investigatory hardship or prejudice to his defense if his request was denied. Although his attorney alluded to "a couple of leads with regard to potential witnesses," the record is devoid of any evidence suggesting who those witnesses were or how they might have been helpful, or that there was otherwise any genuine possibility that additional evidence might be found. Thus, Gipson's request for a continuance was not "supported by evidence showing good and sufficient cause." Accordingly, we hold that the request was properly denied. *Green v. State, supra.*

AFFIRMED.